OPINION
Robert R. Martin appeals from the October 21, 1997 judgment of conviction entered by Judge Timothy J. McGinty after the jury found Martin guilty of the aggravated murder of Rocco V. Buccieri, Jr.; the aggravated robbery and kidnapping of Buccieri, William Lain, and Brianne Stewart, with the further finding that Martin did not release the victims both unharmed and in a safe place. Martin raises eight assignments of error challenging the weight and sufficiency of the evidence against him and the conduct of the prosecutor. He also challenges the judge's evidentiary rulings, jury instructions and sentencing decision. We do not agree with his assignments of error and affirm.
From the record, we glean the following: Buccieri was the general manager of a Papa John's Pizza store at the corner of Turney Road and Danbury Avenue in Garfield Heights. At about 7:30 p.m. on December 22, 1996, while Stewart cut cheese sticks and Buccieri prepared pizzas, two young black males entered the store. One male, later identified as Charles Marshall, was dressed in black, had a scarf covering his mouth and nose, and was brandishing a gun. He jumped over the front counter and ordered Buccieri, Stewart and Lain to the back of the store. The second intruder was dressed in a similar fashion and walked around the counter. During the trial the state endeavored to identify this second man as Martin.
Lain noticed that the gun held by Marshall was a "badly worn" .38 revolver. At trial he identified the state's exhibit as "look[ing] very, very much" like the gun carried by Marshall. Stewart said that, as far as she could tell, the second man did not have a gun and appeared nervous. As the five stood in the back of the store near the restroom, Marshall ordered Buccieri to open the safe but Buccieri explained that it was "time-set," meaning that the safe could not be opened for a given period after entering the code. Marshall then frisked Stewart and Lain and ordered them to go into a utility closet located in the restroom. As Marshall and Buccieri walked to the front of the store, Stewart testified that the second man closed the louvered door of the closet and she recognized that the athletic shoes worn by this second man bore the logo of the white and either black or navy-blue Fila-brand. At trial she identified the state's exhibit, a pair of Fila-brand athletic shoes, as the type and color worn by that second man.
Lain testified he next heard the sound of yelling; he described it as "screaming questions," to which Buccieri responded, in a frustrated tone, that he could not open the safe. Lain then heard the sound of a large counter being moved, and both he and Stewart heard the sound of the metal pizza screens hitting the tile floor. They both heard a gunshot, and after a brief pause, two more gun shots followed.
A short time after the last gun shot, Lain and Stewart left the closet and found Buccieri between the oven and a preparatory table, lying on his back, bleeding from his head and breathing heavily. Lain called 911.
Buccieri was transported to MetroHealth Medical Center where, despite surgery to repair his left lung, diaphragm and stomach, he died on December 23, 1996 at 5:30 a.m. He had sustained two bullet wounds; the first bullet entered his body just below his left shoulder and went through the eighth rib, perforating the left lung, diaphragm and stomach. The entrance wound showed fouling, indicating that the muzzle of the gun was pressed against Buccieri's skin. The second bullet entered the left temporal region, traveled through the skull and brain, and lodged on the right side of the head beneath the scalp above and behind his right ear. Because that entry wound contained no fouling or stippling, the pathologist testified that the gun was fired at a distance greater than two and one-half to three feet from Buccieri.
Officers Larry Szczepanski and David Bailey, of the Garfield Heights Police Department, responded to the call that night. At the scene, they observed two sets of foot prints in the snow, one set coming to and leaving the Papa John's store. One set were boot prints; the other set had a distinctive pattern from an athletic shoe "resembl[ing] a figure eight." Szczepanski followed the set of boot prints that led away from the store and, after noting that the stride was larger than that going into the store, concluded that the person wearing those boots had been running. Szczepanski followed the boot prints westbound, across the parking lot and then to Danbury. The prints proceeded westbound on Danbury to East 111th
Street where they turned south and at the intersection of Mountview Avenue turned east.
Bailey followed the athletic shoe prints, which had separated from the boot prints, across Danbury, then across a yard where it appeared from an impression left in the snow, the person wearing the athletic shoes had fallen while climbing a fence. He followed the prints across the yard to Mountview, where they rejoined the boot prints. Bailey testified that the tread on the state's exhibit Fila-brand athletic shoes matched the athletic shoe impressions he followed in the snow.
When the boot prints and the figure-eight prints joined up, they crossed to the south side of Mountview and proceeded westbound across East 111th Street and ended at a tree lawn in front of a yellow house on Mountview. At that location, Szczepanski noted a set of tire tracks in the street that "fishtailed" out into the middle of the street and continued eastbound on Mountview towards Turney Road; he concluded that a vehicle had left in a rather hasty fashion.
In order to identify Martin as a participant in the Papa John's murder, robberies, and kidnappings, the state presented evidence of the robbery of a Long John Silver's restaurant in Maple Heights on October 22, 1996. Dawn Lisser, an employee of restaurant, testified that around 10:00 p.m. on that date, a man had entered the restaurant through the drive-in window, and placed a gun to her back. She stated that she later could see his face clearly and he was joined by an accomplice.
When the intruders entered the restaurant, Vershoun Jackson, the assistant manager, was in the freezer doing inventory. She heard the door open and turned to find a black revolver in her face. At trial, she identified the man holding that gun as Charles Marshall. When Marshall led her out of the freezer and up to the front of the store, she noticed a second man dressed in green army fatigues with a blue and white bandanna over his mouth and nose, and a hood over his head. This second man also carried a gun, described as silver in color, tucked within the sleeve of the jacket.
Jackson opened the safe in the front of the store and Marshall removed the money. He and the accomplice left after ushering Jackson, Lisser and two other employees into the walk-in freezer.
Lisser testified she later saw Charles Marshall while both were passengers on an RTA bus. When Marshall saw her, he tried to avoid her stare, taking the collar of his dark coat and "putting it over his head so I couldn't see him." Rather than risk the chance he might discover where Lisser lived, she exited the bus at Southgate Mall and called her manager at Long John Silver's, telling her of seeing the robber.
Jackson testified she saw Marshall and Martin on November 26, 1996, when they entered her Long John Silver's restaurant. She watched them as they stood at the counter looking around as they eventually placed an order. A third man entered, Marshall and Martin greeted him, and the three left. She ran to the window, noted that the three saw her looking out. She saw Martin and the third man drive away in an Isuzu Tracker and Marshall run away on foot.
Jackson further testified about seeing Martin and Marshall in her restaurant on January 23, 1997. She was in the kitchen preparing an order for a drive-thru customer when she heard the chimes on the doors. She noticed a lone customer in the dining room but, upon seeing no one else, returned to preparing the drive-thru order. She next looked up to find Marshall pointing a gun at the customer, Jackson then stooped behind the counter and activated the security button located on a rope around her neck.
Marshall then brought the customer around the counter, gathered Jackson and three other employees together, took them to the back room and frisked them to determine whether they carried a cellular telephone. A second man, later identified as Martin, entered at this point, wearing a pair of khaki pants, a red sweat shirt, a red skull cap and a red, black and white bandana covering his mouth and nose. Marshall herded the three employees and the customer into the cooler. He took Jackson to the front and while pointing a gun at her, he told her to open the safe.
She described the gun as the "[s]ame one from October — was a black revolver." Marshall cursed Jackson, telling her she was a "dead B" because she knew who he was. He pushed her out of the way and began filling a pillowcase with money. He then demanded that she open another part of the safe and, as she fumbled with her keys, she saw Marshall look toward the parking lot. He yelled "5-0," letting Martin know that the police had arrived.
Patrolman Laniel Hunter, of the Maple Heights Police Department, responded to a radio dispatch of the robbery, drove his patrol car to the rear of the Long John Silver's restaurant and readied his rifle. He watched two men exit the rear door of the restaurant, identified himself and ordered them to stop. They hesitated, then began to flee, and Hunter again demanded that they halt. At that point, a man he described as wearing a black sweatshirt, mask and gloves, turned, planted his feet, and fired his revolver at Hunter who then dove inside the patrol car. Hunter got out of the car, again demanded the men stop and, again, the man in black turned and fired another shot. Hunter responded by firing his rifle. The second man, dressed in khaki pants and a red sweatshirt with a slip of reddish-colored hair showing under his hat at the collar, slipped on the ice and fell. Hunter tracked the two to the rear of a house on Century Way and watched them enter.
Officer Gerald Prusha arrived at the front of the house and radioed for backup. Hunter then saw a man he recognized as Darnell Weeks exit the house; he placed Weeks in handcuffs. Then a second man with reddish-colored hair wearing dark-colored clothing exited the house. Hunter recognized him as a local who hung around the high school and concluded that this was the man he had seen earlier wearing the khaki pants and red sweatshirt. At trial, Hunter identified Martin as the man he had seen wearing the khaki pants and red sweatshirt.
After securing Martin in handcuffs, Hunter and the other police officer searched the home for the "shooter." They discovered a red sweatshirt and khaki pants, both damp, under the stairs leading into the basement. They also discovered Marshall, still dressed in black with the mask in his back pocket, between a basement shower stall and the wall, under a pile of clothing. They found hidden within the clothing a .38 special containing five live rounds and one spent cartridge. Hunter recognized Marshall as the shooter and identified the state's exhibit as the gun taken from the pile of clothing. In addition, Officer Dennis Bruening, who was also present at the Century Way home, identified the state's exhibit Fila-brand athletic shoes as the shoes worn by Martin at the time of his arrest.
The officers brought Darnell Weeks to the Long John Silvers, but the employees did not recognize him as one of the robbers. Dana Hill, who worked the cash register that day, had known Weeks for a couple of years and said that he was taller than the robbers. She could not identify either Marshall or Martin as the robbers.
At around 10:00 a.m. on January 30, 1997, Garfield Heights Police Officer Paul Mazzola and his partner picked up Martin at the Maple Heights Police Department. They advised him of his Miranda rights and took him to the Garfield Heights Police Station where they again read to him his rights from a form and Martin signed the waiver of rights line at the bottom of the form. During the course of the interview, Martin admitted being involved in the Papa John's Pizza robbery and said he would show the officers how he and Marshall escaped. After speaking with Martin for about one hour, they left for the pizza parlor.
From the back seat of the patrol car, Martin showed the officers his escape route from Papa John's and pointed out the yellow house on Mountview where they had parked the get-a-way vehicle on the night of the robbery. Upon returning to the station, they booked Martin and asked whether he would give a statement. Martin agreed and, at approximately 1:05 p.m., they took his videotaped statement.
In that videotaped statement, Martin admitted being present during the Papa John's robbery and that Charles Marshall shot Buccieri. He also admitted wearing a pair of dark blue and white Fila-brand athletic shoes the night of the robbery, but he could not remember the clothing he wore.
At trial, Nancy Bulger of the Bureau of Criminal Identification, testified she test fired the gun found with Marshall and compared that bullet with one extracted from Buccieri's body. While she determined they were fired from the same gun she could not positively state they were fired from the Marshall gun because it did not have "enough usable microdetail" to compare them positively. She stated guns can be altered to disguise microdetail and explained the process.
On March 31, 1997, Martin was indicted for aggravated murder with felony murder and firearm specifications, three counts of aggravated robbery with firearm specifications and three counts of kidnapping with firearm specifications.
On October 3, 1997, the jury convicted Martin of the aggravated murder of Buccieri but acquitted him of the two "principal offender" specifications. It also found him guilty of the separate counts of the kidnapping and aggravated robbery of Buccieri, Stewart, and Lain but acquitted him of the two firearm specifications attached to each count, possession of a firearm while committing the offense, R.C. 2941.14.1, and displaying, brandishing, or indicating possession of a firearm while committing an offense, R.C. 2941.14.5. He was sentenced to life in prison for the killing of Buccieri, nine years consecutive with two five-year concurrent sentences for the aggravated robberies and nine years consecutive with two five-year concurrent sentences on the kidnappings. Martin's additional sentence of 22 years following a jury verdict of guilty in a separate trial on the Long John Silver's robbery was to be served consecutively with that of the Papa John's case.
Martin's first assignment of error states:
 I. THE TRIAL COURT IMPROPERLY DENIED THE APPELLANT'S MOTION TO SUPPRESS VIDEOTAPED STATEMENT IN VIOLATION OF THE FOURTEENTH, FIFTH AND SIXTH AMENDMENTS OF THE U.S. CONSTITUTION.
Martin submits that on January 30, 1997, he was being represented by an attorney for the charges arising out of the January 23, 1997, Long John Silver's robbery. Because the Garfield Heights police failed to ask the Maple Heights police or him about having legal representation, his videotaped statement should have been suppressed. Moreover, because he had invoked his right to remain silent on January 23, 1997, he should not have been subject to further questioning by Garfield Heights police. In support of the latter contention, Martin points out that the judge suppressed a statement given by Martin on January 24, 1997, on the Silver's robbery because he had earlier declined to be questioned and was not given his Miranda rights again, when questioned the following day. The state counters that nothing on the record shows that Martin ever exercised his right to counsel before his statement in Garfield Heights.
Once an accused invokes his right to have counsel present during custodial interrogation, all questioning must cease, and the accused may not be subjected to further interrogation by police until counsel is made available or unless the accused initiates further communication with the police. State v. Raglin (1998),83 Ohio St.3d 253, 262, 699 N.E.2d 482, citing Edwards v. Arizona
(1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885,68 L.Ed.2d 378, 386. However, there is nothing in the record to evidence Martin invoked his right to counsel at any time before or during the January 30, 1997 custodial interrogation.
The transcript of the hearing on the motion to suppress his statements shows that the Garfield Heights police advised Martin of his rights at around 10:15 a.m., before leaving the Maple Heights police station. According to Detective Mazzola, they spoke to him about the Papa John's incident only after arriving at the Garfield Heights police station and after advising him again of his rights. Martin agreed to reveal the path he and Marshall took from the Papa John's restaurant, did so, and agreed to give a taped statement. Martin signed the written "advice of rights" form at 1:07 p.m., and proceeded to give his statement. The Garfield Heights police were not aware that Martin had an attorney until January 31, 1997, when Martin's attorney left word at the station that the interviews with his client were to cease.
An accused's signed waiver form is strong proof that the waiver was valid. State v. Moore (1998), 81 Ohio St.3d 22, 32,689 N.E.2d 1. Moreover, even if the record showed that Martin was represented by counsel on the pending charges related to the Long John Silver's robbery, that would not prevent Garfield Heights police from questioning him on the unrelated Papa John's Pizza murder. State v. Hill (1995), 73 Ohio St.3d 433, 445-446,653 N.E.2d 271. Based upon the record before us, there is nothing to show that Martin invoked his right to counsel anytime before January 31, 1997. The judge properly denied Martin's motion to suppress the videotaped statement. Martin's first assignment of error is overruled.
 II. THE TRIAL COURT FAILED TO DETERMINE THE APPELLANT'S PRE-TRIAL MOTIONS IN VIOLATION OF CRIM.R. 12(E) AND DENIED THE APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION.
Martin asserts that the judge did not conduct a hearing on the motion to suppress identification even though his lawyer had requested a ruling on all defense motions and the judge agreed to do so before trial. According to Martin, the judge not only failed to state his findings of facts on the record, he allowed the identification testimony of various witnesses from the Long John Silver's trial to connect him to the crimes charged in the present matter. The state points out that Martin's lawyer never asked the judge to state his findings of fact for the record.
Crim.R. 12(E) requires the trial judge to rule upon a motion made pursuant to subdivision (B)(1) through (5) before trial. Subdivision (B)(3) requires the defense to raise by motion before trial the request "to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained. Such motions shall be made in the trial court only." See generally State v. French (1995), 72 Ohio St.3d 446,449-450, 650 N.E.2d 887, distinguishing motions in limine and motions to suppress. Crim.R. 47 further requires that a motion, other than one made during the course of trial, be made in writing. The written motion must "state with particularity the grounds upon which it is made and shall set forth the relief sought. It shall be supported by a memorandum containing citations of authority, and may also be supported by an affidavit." Crim.R. 47. If factual issues are involved in determining a motion, the judge must state the essential findings on the record. Crim.R. 12(E).
A review of the record shows that, while Martin's lawyer filed a Motion for Voir Dire of Identification Witnesses and for OrderDisclosing Other Evidence Used in the Identification Procedure anda Motion to Suppress other evidence not pertinent to the discussion here, he did not file a written motion to suppress identification testimony pursuant to Crim.R. 12(B)(3) and Crim.R. 47.
The record also discloses that Martin's lawyer twice mentioned during the course of trial that the judge had failed to rule on pretrial motions. In the first instance, he failed to identify the particular motions after the judge both asked that counsel do so and stated that he would be "happy" to rule on the motions at that point. In the second instance, the judge reiterated his question and asked counsel to identify the motions. Martin's lawyer raised the issue regarding other motions but did not mention or address the issue of identification procedure. In addition, we note that the record discloses that he raised an objection to the testimony of every identification witness associated with the incidents at Long John Silver's restaurant at the time the witness took the stand.
Because Martin's lawyer did not file a written motion pursuant to Crim.R. 12(B)(3) and Crim.R. 47, the judge was not obligated by Crim.R. 12(E) to "rule" upon it before trial as Martin's assignment of error suggests. Therefore, this second assignment of error is without merit and therefore is overruled.
 III. THE TRIAL COURT IMPROPERLY ALLOWED OTHER ACTS EVIDENCE IN VIOLATION OF EVID.R. 404(B) AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
Martin argues that his trial was "infected" with other acts evidence of his involvement with the Long John Silver's robberies. The events were unremarkable fast-food restaurant robberies that shared no unique facts in common. Martin claims that he was prejudiced by the introduction of this evidence.
The state asserts that the similarities in Long John Silver's robberies were indicative of a modus operandi linking Martin to the Papa John's crimes. Therefore, the testimony about such evidence was properly admitted.
The Supreme Court recently addressed the admissibility of "other acts" evidence under Evid.R. 404(B) in State v. Bey (1999),85 Ohio St.3d 487, 709 N.E.2d 484.
 Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's criminal propensity. "Other acts" evidence is admissible, however, if "(1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." State v. Lowe (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 619; see, also, Evid.R. 404(B). Identity can be proven by establishing a modus operandi applicable to the crime with which a defendant has been charged. See Lowe, 69 Ohio St.3d at 531, 634 N.E.2d at 619. But in order "[t]o be admissible to prove identity through a certain modus operandi, other acts evidence must be related to and share common features with the crime in question." Lowe, 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus; see, also, State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus ("Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404[B].") For example, "evidence of `other acts' to prove * * * the identity of the perpetrator is admissible where two deaths occur under almost identical circumstances." State v. Smith (1990), 49 Ohio St.3d 137, 551 N.E.2d 190, syllabus. [Bey, 85 Ohio St.3d at 490].
The admission or exclusion of relevant evidence rests within the sound discretion of the judge. State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.
With regard to the present case, the "other acts" evidence established a "behavioral fingerprint" linking Martin to the crime based upon the common features shared by the Papa John's robbery and the Long John Silver's robberies. See Lowe,69 Ohio St.3d at 531. In both instances, the robbers came into the front of the restaurant and put a gun to the manager, forcing the manager to the area of the store containing the safe. In both instances, one robber frisked the employees searching for cellular telephones. In both instances, the robbers forced the remaining employees to the back of the restaurant and into a room or freezer, restraining them of their liberty. In both instances, one robber acted as the gunman while the other acted as a lookout or guard. Based upon these common features, and Martin's failure to point out for this court any distinguishing qualities,[1] we conclude that the judge did not abuse his discretion in allowing the "other acts" evidence because it was probative of identity. Martin's third assignment of error is overruled.
 IV. PROSECUTORIAL MISCONDUCT DENIED THE APPELLANT A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE.
Martin claims that the prosecutor committed misconduct by opening the case-in-chief with testimony from Rocco Buccieri's widow. He argues that her testimony about the length of time that they were married and her identification of her husband in a wedding photograph served no purpose other than to inflame the passion and sympathy of the jury. Moreover, at the end of his opening statement the prosecutor stated "now we will hear from the defense as to what their evidence will show." Finally, Martin argues the prosecutor's act of showing the jury during closing argument the wedding photo of the victim, emphasizing that he did not want anyone to forget what the case is about, was highly prejudicial.
The state contends that these instances of alleged misconduct, even if considered "improper," could not have affected the outcome of the trial and, therefore, cannot constitute reversible error.
The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether the rights of the accused were materially prejudiced. State v. Smith (1984),14 Ohio St.3d 13, 14, 470 N.E.2d 883, 885. A reviewing court considers the effect the misconduct had on the jury in the context of the entire trial. State v. Keenan (1993), 66 Ohio St.3d 402,410, 613 N.E.2d 203. With regard to closing arguments, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." State v. Smith (1997), 80 Ohio St.3d 89, 111,684 N.E.2d 668, 689.
Martin attempts to categorize the prosecutor's act of eliciting the testimony of Amy Buccieri, the widow of Rocco Buccieri, Jr., about their brief marriage of seven months and her identification of him in their wedding photograph as "prosecutorial misconduct." In essence, he argues that such testimony constitutes a prejudicial evidentiary error going to the question of relevancy. See State v. Jenks (1991), 61 Ohio St.3d 259, 282, 574 N.E.2d 492; cf. State v. Keenan (1993), 66 Ohio St.3d 402, 411-412,613 N.E.2d 203 (prosecutor's act of improperly impeaching its own witness with prior inconsistent statement in violation of Evid.R. 607 constituted prejudicial error as it contributed to unfairness of defendant's trial due to prosecutorial misconduct). The state points out, however, that Martin's lawyer did not object at any time to the testimony of Amy Buccieri. This court's review of the record, however, shows that Martin's lawyer did, indeed, object to the admission of the wedding picture into the record. Failing to object to the introduction of purportedly irrelevant evidence allegedly used by the prosecution for the purpose of inflaming the passion and emotion of the jury waives appellate review absent plain error. State v. Jenks (1991), 61 Ohio St.3d 259, 282,574 N.E.2d 492. Notice of plain error under Crim.R. 56(B) must be "taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long
(1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. An alleged error is not considered "plain error" unless the outcome of the trial clearly would have been different. Seeid. at paragraph two of the syllabus.
Assuming for the sake of Martin's argument that Amy Buccieri's mere reference to the date of her marriage and her mere identification of her husband in their wedding photograph are not relevant, pursuant to Evid.R. 401, to any fact in issue and wereintended to inflame the passion of the jury, we cannot say that this rather innocuous testimony rose to the level of plain error that would require reversal. Given the length of the trial, the number of witnesses, and the other evidence admitted, it is unrealistic to suggest that the outcome of the trial would have been different but for the disclosure of their wedding date and the identification of the victim in a wedding photograph.
Martin also takes issue with the prosecutor's comment at the very end of his opening statement about Martin's need to present his own evidence of innocence and the reference in closing argument to the wedding photograph accompanied by his request that the jury not forget "what this case is really about" resulted in prejudicial error.
The transcript reveals at the end of his opening statement, the prosecutor thanked the members of the jury for their attention and said, "And now we will hear from the defense as to what their evidence will show." Martin's lawyer objected, and the judge inquired as to what part of the opening statement he objected. Out of the presence of the jury, the judge stated:
 Oh, I didn't even hear that. The jury knows that. They were already told you don't have to produce evidence. But you can also produce evidence from the State's witnesses. It's partially true.
When taken in context, the comment appears to be meant as nothing more than a transition, a way to cede the "floor" to defense counsel rather than suggest that Martin had a duty to produce evidence. In addition, the judge had properly given preliminary instructions regarding the state's burden of proof and informed the jury that the defendant "[has] no obligation to present a case. [He has] no burden of proof under the Constitution of the [United States of] America and that of Ohio." Therefore, any perceived error is harmless. Cf. State v. Stojetz (1999),84 Ohio St.3d 452, 464, 705 N.E.2d 329 (noted that prosecutor mischaracterized standard for weighing aggravating circumstances and mitigating factors during penalty phase, but court found any perceived error harmless since jury instructions and verdict forms contained correct weighing standard). Nevertheless, it would be better practice for the prosecution to restrain its zeal within the mandates of the Code of Professional Responsibility.
With regard to the prosecutor's closing argument, there is no record of an objection, contrary to Martin's assertion, to the following closing remarks:
 Now, ladies and gentleman, in all this, I think at least some of us may have forgotten that this case was really about Rocco Buccieri, and here's a picture of Rocco right after his wedding. You will have an opportunity to see this photo. There's a red or pink imagining [sic] marker arrow pointing to the victim in his case.
 And I wouldn't want anyone to forget that that is what this case is really about. Just for Rocco Buccieri; he died a vicious, senseless, meaningless and untimely death. And he died in the hands of not only Charles Marshall, but Robert Martin.[2]
Because defense counsel did not object to this alleged instance of misconduct, Martin has waived all but plain error. State v. Slagle
(1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 925.
Initially, the prosecutor had asked the jury to listen carefully to the judge's instructions regarding witness credibility and had outlined the testimony of the witnesses. The prosecutor had not mentioned the name of the victim at any time prior to the purportedly improper statement. When taken within the context of the entire closing argument, we cannot find this comment improper since the crime of murder of which Martin was charged necessarily involves the death of the victim. We note, however, the admonition recently given by the Supreme Court: "If this kind of activity continues, it is just a matter of time before it affects the outcome of a trial." State v. Fears (1999), 86 Ohio St.3d 329, 336,715 N.E.2d 136.
 V. THE TRIAL COURT FAILED TO PROPERLY MERGE THE CONVICTIONS AT SENTENCING IN VIOLATION OF R.C. 2941.25 AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
Martin asserts that, while the jury could have properly convicted him of three kidnapping and three aggravated robberies, there was one animus which required the kidnapping and aggravated robbery charges to merge. Therefore, only one sentence should have been imposed for Counts 2 through 7, or one sentence should have been imposed for the aggravated robberies and one sentence for the kidnappings.
The state argues that kidnapping and aggravated robbery are not allied offenses of similar import and Martin was properly sentenced on all charges.
Section 2941.25(B) of the Ohio Revised Code authorizes a judge to convict and sentence a defendant for two or more offenses that have as their origin the same criminal conduct if the offenses are not allied and of a similar import, are committed separately, or are committed with a separate animus as to each offense. This requires the judge to compare the offenses in the abstract. Statev. Rance (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, paragraph one of the syllabus, overruling Newark v. Vazirani (1990), 48 Ohio St.3d 81,549 N.E.2d 520. "Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.'" Id. at 638, quoting State v. Jones (1997), 78 Ohio St.3d 12,14, 676 N.E.2d 80. If they do, then the defendant may not be convicted of both crimes unless the court finds that the defendant committed them separately or with a separate animus. Rance,85 Ohio St. 3d at 638-639.
In State v. Logan (1979), 60 Ohio St.2d 126, 397 N.E.2d, syllabus, the Supreme Court established the guidelines for determining whether kidnapping and another crime are committed with separate animus as to each:
 (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, he confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
 (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
We first note that Martin's lawyer did not object at trial to his conviction and sentence on the basis that the offenses were allied offenses of similar import. The failure to object as such may result in a waiver of the issue for appellate review. State v.Latson (Sept. 30, 1999), Cuyahoga App. No. 72921, unreported. However, as we recently pointed out in Latson, this court has discretion pursuant to Crim.R. 52(B) to address plain error or defects affecting a defendant's substantial rights. We noted inLatson that even in those cases where we concluded that the assignment of error had been waived for review, we clarified why the defendant's substantial rights had not been violated. Latson,supra at 7 n. 2.
This court previously has found aggravated robbery not an allied offense of kidnapping in instances where the restraint and movement of the victim lead to an increased risk of harm and was more than incidental to the robbery. State v. Stewart (Nov. 19, 1998), Cuyahoga App. No. 73255, unreported 1998 WL 811313; State v.Rawls (Apr. 30, 1998), Cuyahoga App. No. 72051, unreported, 1998 WL 213087. Here, the restraint of Buccieri subjected him to a substantial increase in the risk of harm, as his death was separate and apart from the robbery. In addition, the restraint of Laine and Stewart in a storeroom not only further facilitated the robbery of the Papa John's restaurant, it substantially increased the risk of harm separate from the risk of harm involved in the robbery. See Logan, 60 Ohio St.2d at 135. This assignment of error is overruled.
 VI. THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY CONCERNING EYEWITNESS IDENTIFICATION DENIED THE APPELLANT A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
Martin argues that the judge's failure to instruct the jury with the standard OJI eyewitness identification instruction was plain error since all the evidence going to identification was based upon circumstantial evidence. The state argues that the judge did not err because an eyewitness identification instruction need not be given in all cases.
"On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A) (Emphasis added). In addition, the failure to submit proposed instructions in the manner articulated by Crim.R. 30(A) constitutes a waiver of an issue challenging the court's failure to give an instruction. State v. Cook (1992), 65 Ohio St.3d 516, 526,605 N.E.2d 70. "[A]bsent plain error, an appellate court will not consider errors that the defendant failed to object to at the trial level." State v. Thompson (1998), 127 Ohio App.3d 511, 522,713 N.E.2d 456, appeal not allowed (1998), 83 Ohio St.3d 1451,700 N.E.2d 334. A defective jury instruction will not rise to the level of plain error unless the defendant can show that the outcome of the trial would clearly have been different but for the alleged error. Id. at 522-523. This Court will not review a single, allegedly defective jury instruction in isolation but within the context of the entire charge. Id. at 523.
Paragraph 5 of 4 OJI 402.50 suggests that the jury consider the following:
 Some things you may consider in weighing the testimony of identifying witness(es) are:
 1. Capacity of the witness, that is the (age) (intelligence) (defective senses, if any,) and the opportunity of the witness to observe.
 2. The witness' degree of attention at the time he observed the offender.
 3. The accuracy of witness' prior description (or identification, if any).
 4. Whether witness had had occasion to observe defendant in the past.
 5. The interval of time between the event and the identification.
 6. All surrounding circumstances under which witness has identified defendant (including deficiencies, if any, in lineup, photo display or one-on-one).
 If, after examining the testimony of the identifying witness you are not convinced beyond a reasonable doubt the defendant is the offender, you must find defendant not guilty.
There is nothing in the record to show that Martin's lawyer requested the eyewitness testimony instruction contained in paragraph 5 of the Ohio Jury Instructions, 405.20, either at the end of the judge's instruction or in writing, submitted at the conclusion of the evidence or at such earlier time as allowed by the court. Crim.R. 30(A). In addition, he does not argue or show that the outcome of the trial clearly would have been different if the judge sua sponte had instructed the jury on the eyewitness testimony charge. Other than making the blanket assertion that the charge was required because the evidence going to his identification was circumstantial and consisted of other acts evidence, Martin has not explained why this specific cautionary instruction would be required under the facts of this case. SeeState v. Guster (1981), 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (the decision to give such instruction must be decided upon the particular facts of the case). We cannot find merit with the contention that failure to instruct the jury regarding eyewitness testimony constitutes plain error.[3] Martin's sixth assignment of error is overruled.
 VII. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE APPELLANT'S CONVICTIONS
 VIII. THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE.
Martin here asserts that since the identification evidence, other acts evidence, and his confession were improperly admitted, there was no evidence upon which to support the charges or convict him of those crimes. The state claims that the evidence was sufficient to support a conviction on all charges and that the evidence of his guilt was overwhelming.
The entire foundation of Martin's arguments rests squarely upon the merits of the earlier assignments of error. Because this court overruled those assignments of error, Martin's assignments of error regarding the sufficiency and weight of the evidence are rendered moot. App. R. 12(A)(1)(c).
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., CONCUR; JAMES D. SWEENEY, J.,CONCURRING IN JUDGMENT ONLY WITH SEPARATE CONCURRING OPINION.
 _________________________________ ANNE L. KILBANE, JUDGE
[1] See Jamison, 49 Ohio St.3d at 187 ("Admissibility is not adversely affected simply because the other robberies differed in some details.").
[2] Trial counsel did object to the comment following these remarks: "The evidence is overwhelming. This man is guilty."
[3] We note that the judge did, in fact, instruct the jury regarding the test for witness credibility, and the assessment of circumstantial and other acts evidence.